[No. B137693. Second Dist., Div. Three. Dec. 29, 2000.]

SOUTHERN CALIFORNIA EDISON COMPANY, Petitioner, v.
PUBLIC UTILITIES COMMISSION, Respondent.

**COUNSEL**

Ann P. Cohn, Bruce A. Reed; Munger, Tolles & Olson and Henry Weissmann for Petitioner.

Roger J. Peters, Christopher J. Warner and Ann H. Kim for Pacific Gas and Electric Company as Amicus Curiae on behalf of Petitioner.

E. Gregory Barnes for Southern California Gas Company and San Diego Gas & Electric Company as Amici Curiae on behalf of Petitioner.

Peter Arth, Jr.; Mary F. McKenzie; Ida M. Passamonti; and Joel T. Perlstein for Respondent.

**OPINION**

**ALDRICH, J.—**

INTRODUCTION

Petitioner Southern California Edison Company (SCE) sought a writ of review of Public Utilities Commission (PUC or Commission) Decision No. 99-11-057 and Resolution E-3606, both denying SCE the ability to establish a "memorandum account" effective January 1, 1999. We issued the writ. SCE urges the PUC abused its discretion and failed to proceed in the manner required by law insofar as it failed to recognize the memorandum account came into existence by operation of law on January 1, 1999. We agree.

SCE filed with the PUC an advice letter, attaching a tariff, which established a memorandum account to track its financing costs on fuel oil reserves. A memorandum account is used by utilities to track various expenses. Expenses so recorded may in the future be reviewed by the PUC for possible inclusion in rates. Unless expenses are included in such accounts, a utility may not seek to pass them on to customers later. SCE's tariff purported to establish its memorandum account effective January 1, 1999. The PUC's Resolution E-3606 allowed SCE to establish the memorandum account, but with an effective date of August 5, 1999. The PUC's action effectively precluded SCE from attempting to recover in rates costs incurred between January 1, 1999, and August 5, 1999, amounting to $1.3 million.

The key questions before us are: (1) Does a tariff that does not increase rates become effective by operation of law 40 days after filing pursuant to Public Utilities Code section 455[1] and the PUC's General Order 96-A (GO 96-A), unless suspended by the PUC during that period? (2) Did SCE, by specifically requesting that the PUC issue a resolution approving its memorandum account, effectively "opt out" of the operation of section 455 and GO 96-A? (3) Was the PUC's imposition of the August 5, 1999 date a permissible exercise of its power under section 455 to modify or alter a tariff that had become effective under that section?

---

[1] All further undesignated statutory references are to the Public Utilities Code.

We hold that a memorandum account may be established via the advice letter procedure outlined in GO 96-A and, as it was not suspended by the PUC, SCE's memorandum account became effective upon the expiration of 40 days from the filing date. We further hold SCE did not "opt out" of, or waive its right to rely upon, the operation of section 455 and GO 96-A. Finally, we find the PUC's subsequent imposition of an August 5, 1999 date cannot be justified as a modification or alteration after a hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Background facts.*

SCE is an investor-owned public utility providing electrical service in portions of California. Respondent PUC is the administrative agency responsible for regulating California's public utilities. (Cal. Const., art. XII, §§ 1-6; Pub. Util. Code, § 216.)

SCE owned 12 California power plants, fueled primarily by natural gas. SCE maintained a reserve of low-sulfur fuel oil that could be used to operate these plants in the event a natural disaster made it impossible to deliver natural gas to them.

In 1996, the Legislature restructured and deregulated California's electric utility industry. (§ 330 et seq.) As part of that restructuring, the Legislature directed formation of an independent system operator (ISO), which was to have broad responsibility for operating the utilities' transmission systems. (§§ 330, subd. (k), 345-350.) The Legislature also required the PUC to "identify and determine those costs and categories of costs for generation-related assets and obligations . . . that may become uneconomic as a result of a competitive generation market," including transition costs, and to determine whether such costs were reasonable and should be recovered from consumers. (§ 367.)

As a consequence of the restructuring, SCE sold the 12 plants. With the approval of the PUC, SCE retained the oil reserves until the ISO determined whether or not they were necessary for system reliability. (Cal. P.U.C. Dec. No. 97-11-074.)

### 2. *PUC authorization to record carrying costs of SCE's fuel oil reserves in a memorandum account during 1998.*

As used herein, a "memorandum account" is an accounting device used by a utility to record various expenses and costs it incurs. The utility may later

seek authorization from the PUC to recover the recorded amounts by passing them on to consumers in rates. The establishment of a memorandum account, and the recording of expenses in the account, do not guarantee that the utility will ultimately be authorized to recoup the tracked amounts in rates. However, a utility is precluded from attempting to recover amounts not recorded. According to the PUC, "[m]emorandum accounts are ratemaking tools within the authority of the Commission to authorize, on a case by case basis, when found to be reasonable and necessary. . . . They are designed to record expenses that the Commission subsequently reviews for possible inclusion in rates."

In late 1997, the PUC authorized SCE to record in a memorandum account SCE's carrying costs, i.e., the financing costs on its investment in the fuel oil reserves. (Cal. P.U.C. Dec. No. 97-11-074.) The PUC authorized recording of the costs for 1998 only; Dec. No. 97-11-074 did not address treatment of the costs after 1998.

3. *SCE's attempt to establish a memorandum account to track costs incurred in 1999.*

SCE wished to continue to track its fuel oil carrying costs during 1999 so that it could later seek PUC approval to pass these costs on to consumers. To that end, on November 20, 1998, SCE filed with the PUC advice letter No. 1351-E.[2] The advice letter attached a schedule creating a new memorandum account in SCE's tariff, dubbed the "Fuel Oil Inventory Memorandum Account" (FOIMA). The advice letter pointed out that the ISO had not yet determined whether SCE's fuel oil reserves were needed for system reliability, and SCE did not believe a final determination by the ISO would be made during 1998.[3] Under a section entitled "Effective Date," the advice letter stated: "*It is requested that this advice filing become effective on the 40th calendar day after the date filed, which is January 1, 1999. Since this advice filing proposes the establishment of a new memorandum account, a resolution is required for approval.*" (Italics added.)

Enron (a private energy company) and the PUC's Office of Ratepayer Advocates (ORA) protested SCE's advice letter on various grounds. The ORA contended that allowing further recording of the costs in a memorandum account would provide a disincentive to SCE to push for resolution of the question by the ISO. SCE filed with the Commission written responses to these protests.

---

[2]An "advice letter" is an informal request to change rates, services, or other aspects of a utility's tariff sheets.

[3]In fact, no determination was made until August 26, 1999, when the ISO found SCE's fuel oil inventory was not required for system reliability.

The PUC prepared a draft resolution in response and sought comment from interested parties, including SCE. SCE filed comments and proposed changes to the draft. One of the issues explicitly addressed during this process was the effective date of the FOIMA. Initially, the PUC proposed to make the FOIMA effective in June 1999, to coincide with the date of an expected PUC decision on another issue related to SCE. SCE argued against such a move, contending the effective date should be January 1, 1999, the date originally stated by SCE. SCE urged that: (1) implementing the proposed effective date in June 1999 would result in automatic disallowance of reasonably incurred costs for "at least the first half of 1999 . . ."; (2) such a disallowance "would be grossly unfair" in that it would "deny SCE an opportunity to recover such costs given that the delay in resolution of the fuel oil issue is beyond SCE's control . . ."; and (3) SCE timely and "in full compliance with the Commission's General Order 96-A, Section IV.B., . . . properly filed Advice 1351-E . . . 40 days prior to SCE's requested FOIMA effective date . . . ." In a subsequent "draft alternate" resolution, the PUC adopted the January 1, 1999 date SCE had requested.

### 4. *The Commission's resolution.*

On August 5, 1999, the PUC issued Resolution E-3606 (Resolution E-3606), approving the FOIMA. However, the PUC made the FOIMA's effective date August 5, 1999, the date the resolution was adopted. Thus, it authorized SCE to record only the costs incurred after August 5, 1999, effectively precluding SCE from later seeking to recover carrying costs incurred between January 1, 1999, and August 5, 1999. According to SCE, the carrying costs incurred during these months amounted to approximately $1.3 million.

Resolution E-3606 expressly addressed the effective date issue. It stated: "The FOIMA will become effective upon adoption of this Resolution and will terminate no later than January 31, 2000. There is no existing authority for Edison to book these costs to a memorandum account after December 31, 1998, and the Commission's policies concerning prospective ratemaking preclude making the FOIMA effective prior to the adoption of this Resolution." It reasoned, "Edison is asking us to make the FOIMA effective as of January [1999]. To do so would be to allow Edison to recover carrying costs on its fuel oil inventory for a period during which there was no memorandum account into which it was authorized to book that expense. Therefore, doing so would be inconsistent with our repeatedly stated policy."

### 5. *SCE's application for rehearing and the Commission's denial.*

On September 16, 1999, SCE filed a timely application for rehearing of Resolution E-3606. SCE argued, inter alia, that the PUC had committed

legal error by refusing to recognize that the advice letter and tariff establishing the FOIMA became effective, by operation of law, on January 1, 1999. SCE urged that: (1) Resolution E-3606 violated GO 96-A, which requires that tariffs not increasing rates become effective after not less than 40 days unless suspended by the PUC; (2) the PUC's reliance on the retroactive ratemaking doctrine was misplaced because the account went into effect by operation of law on January 1, 1999, and thus adoption of a January 1 date would not constitute authorization of a retroactive account; (3) the PUC had sometimes allowed the establishment of memorandum accounts with retroactive effective dates, i.e., an effective date prior to the date of PUC approval of the account; and (4) the PUC's current practices caused uncertainty and inconsistency, as utilities could not be sure when their memorandum account requests would be approved, making effective dates vary between 40 days after the filing to "any possible date in the future."

On November 18, 1999, the PUC denied SCE's application for rehearing. (Cal. P.U.C. Dec. No. 99-11-057.) The PUC reasoned that a memorandum account could not be established without formal PUC approval. It concluded that GO 96-A "provides for, but does not automatically authorize, certain tariff sheets filed by advice letter becoming effective after the fortieth day of the advice letter filing, unless the filing is suspended by the [PUC]." Moreover, the PUC concluded that SCE had understood the memorandum account would not become effective until approved by the PUC, because SCE's advice letter stated, "[s]ince this advice filing proposes the establishment of a new memorandum account, *a resolution is required for approval.*" (Italics added.) The PUC also noted that, in light of the protests filed against SCE's advice letter, it was not possible for the PUC to approve the memorandum account within the 40-day time frame referenced in GO 96-A. PUC policy precluded approval of memorandum accounts retroactively, and this policy was consistent with a well-established prohibition against retroactive ratemaking. The PUC conceded that it had sometimes made memorandum accounts effective before the approval date, but only when a statute or an earlier PUC decision had authorized the accounts.

6. *Relief requested in this court.*

On December 22, 1999, SCE timely filed a petition for writ of review pursuant to section 1756, subdivision (a), requesting that we review the PUC's decision to make the effective date of the FOIMA August 5, 1999, rather than January 1, 1999. SCE requests that we set aside the PUC's Resolution E-3606 and Decision No. 99-11-057 insofar as they fail to recognize the FOIMA was effective January 1, 1999.

CONTENTS

SCE contends that the PUC's decisions in Resolution E-3606 and Decision No. 99-11-057 misconstrued GO 96-A and section 455. SCE contends that these provisions create "a default rule of effectiveness: unless the Commission acts to suspend it, the tariff goes into effect. Accordingly, the effective date is not dependent on Commission action, except in the sense that the Commission may postpone the effective date by suspending the tariff." SCE asserts that a clear procedural path is necessary to enable SCE to change tariffs without undue delay, and section 455 and GO 96-A were designed for that very purpose—to provide quick and automatic implementation of non-rate tariffs. Thus, SCE argues, because the PUC did not suspend SCE's tariff, the memorandum account automatically became effective by operation of law on January 1, 1999.

Amici Curiae Pacific Gas and Electric Company (PG&E), Southern California Gas Company, and San Diego Gas & Electric Company concur in SCE's arguments, and also point out that quick implementation of non-rate tariffs·is particularly important in this era of competitive energy markets: "Under the . . . PUC's policy, a utility wishing to change a rate schedule, classification, contract, practice or rule must wait an indefinite period for the . . . PUC to act upon its advice letter before such rate schedule, classification, contract, practice or rule can go into effect. . . . [¶] In the restructured and newly competitive energy and telecommunications markets, utilities such as [SCE and amici curiae] cannot afford to wait months or even years for the . . . PUC to act on advice letters. Utilities are expected to respond quickly to their customers['] needs, or those customers will take their business elsewhere."

The PUC, for its part, makes three central contentions. First, the PUC asserts that a memorandum account cannot come into existence without PUC approval. Thus, because the FOIMA was not effective until it was approved by the PUC on August 5, 1999, allowing an earlier effective date would violate the PUC's long-standing policy against retroactive establishment of memorandum accounts. Second, the PUC asserts that in any event, in this instance SCE requested PUC approval, effectively foreclosing to it any "automatic" approval process mandated by GO 96-A and section 455. Third, the PUC points out that it has the power, under section 455, to modify or alter tariffs after a hearing, and its procedures here were tantamount to such a hearing.

## DISCUSSION

### 1. *Standard of review.*

Section 1756, as amended effective January 1, 1998, allows litigants challenging decisions of the PUC to petition this court directly for a writ of review. Section 1757 delimits the scope of our review of PUC decisions. As pertinent here, section 1757 requires us to determine whether the PUC abused its discretion or failed to proceed in the manner required by law. (§ 1757, subd. (a)(2) & (5).)

█ The interpretation of a regulation, like the interpretation of a statute, is a question of law subject to our independent review. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7-8, 12 [78 Cal.Rptr.2d 1, 960 P.2d 1031]; *Culligan Water Conditioning v. State Bd. of Equalization* (1976) 17 Cal.3d 86, 93 [130 Cal.Rptr. 321, 550 P.2d 593]; *State Farm Mutual Automobile Ins. Co. v. Quackenbush* (1999) 77 Cal.App.4th 65, 72, fn. 2 [91 Cal.Rptr.2d 381].) An administrative agency's interpretation of its own regulations is entitled to consideration and respect by the courts. (*Yamaha Corp. of America v. State Bd. of Equalization, supra,* at p. 7.) However, "The level of deference due to an agency's regulatory interpretation turns on a legally informed, commonsense assessment of its merit in the context presented." (*State Farm Mutual Automobile Ins. Co. v. Quackenbush, supra,* p. 71; *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 799 [85 Cal.Rptr.2d 844, 978 P.2d 2]; *Yamaha Corp. of America v. State Bd. of Equalization, supra,* at p. 12.) "Whether judicial deference to an agency's interpretation is appropriate and, if so, its extent—the 'weight' it should be given—is thus fundamentally *situational.* A court assessing the value of an interpretation must consider a complex of factors material to the substantive legal issue before it, the particular agency offering the interpretation, and the comparative weight the factors ought in reason to command." (*Yamaha Corp. of America v. State Bd. of Equalization, supra,* at p. 12.) " 'A court is more likely to defer to an agency's interpretation of its own regulation than to its interpretation of a statute, since the agency is likely to be intimately familiar with regulations it authored and sensitive to the practical implications of one interpretation over another.' " (*Ibid.*)

█ The PUC is "not an ordinary administrative agency, but a constitutional body with broad legislative and judicial powers." (*Wise v. Pacific Gas & Electric Co.* (1999) 77 Cal.App.4th 287, 300 [91 Cal.Rptr.2d 479].) The PUC's decisions are presumed valid. (*Greyhound Lines, Inc. v. Public Utilities Com.* (1968) 68 Cal.2d 406, 410-411 [67 Cal.Rptr. 97, 438 P.2d 801];

*Pacific Bell v. Public Utilities Com.* (2000) 79 Cal.App.4th 269, 283 [93 Cal.Rptr.2d 910] [PUC's decision on procedural matters will not be disturbed absent an abuse of discretion or unreasonable interpretation of relevant statute].)

2. *Applicable legal principles.*

The California Constitution and the Public Utilities Code empower the PUC to establish rules and prescribe a uniform system of accounts for all public utilities. (Cal. Const., art. XII, § 2 ["Subject to statute and due process, the commission may establish its own procedures."]; Cal. Const., art. XII, § 6 ["The commission may fix rates, establish rules . . . and prescribe a uniform system of accounts for all public utilities subject to its jurisdiction."]; § 701 ["The commission may supervise and regulate every public utility in the State and may do all things, whether specifically designated in this part or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction."].) Section 794 provides that the PUC may, after notice and hearing if requested, "prescribe by order the accounts in which particular outlays and receipts shall be entered, charged, or credited."

Section 489, subdivision (a), requires public utilities to file a tariff[4]—"a schedule 'showing all rates, tolls, rentals, charges, and classifications . . . together with all rules, contracts, privileges, and facilities which in any manner affect or relate to rates, tolls, rentals, classifications, or service.' " (*Pacific Bell v. Public Utilities Com., supra,* 79 Cal.App.4th at pp. 273-274; GO 96-A, § I, subd. (A).)

Section 455 prescribes the procedure to be followed when a utility files a tariff not increasing or resulting in an increase in rates. That section states: "Whenever any schedule stating an individual or joint rate, classification, contract, practice, or rule, not increasing or resulting in an increase in any rate, is filed with the commission, it may, either upon complaint or upon its own initiative, at once and if it so orders without answer or other formal pleadings by the interested public utility or utilities, but upon reasonable notice, enter upon a hearing concerning the propriety of the rate, classification, contract, practice, or rule. Pending the hearing and the decision thereon

---

[4]GO 96-A defines "tariff schedules" and "tariff sheets" as "the entire body of rates, tolls, rentals, charges and classifications and rules collectively as enforced by a public utility, although the book or volume incorporating the same may consist of one or many sheets applicable to distinct service classifications. The term 'Tariff Sheet,' refers to individual sheets of such volume constituting the entire tariff schedules of the utility, and including title page, preliminary statement, table of contents, service area maps, rate schedules, rules, sample forms, and summary list of contracts and deviations."

the rate, classification, contract, practice, or rule shall not go into effect. Except as provided in Section 455.1, the period of suspension of the rate, classification, contract, practice, or rule shall not extend beyond 120 days beyond the time when it would otherwise go into effect unless the commission extends the period of suspension for a further period not exceeding six months. On the hearing the commission shall establish the rates, classifications, contracts, practices, or rules proposed, in whole or in part, or others in lieu thereof, which it finds to be just and reasonable. [¶] All rates, classifications, contracts, practices, or rules not so suspended shall become effective on the expiration of 30 days from the time of filing thereof with the commission or a lesser time as the commission may grant, subject to the power of the commission, after a hearing had on its own motion or upon complaint, to alter or modify them."

The PUC's GO 96-A implements section 455, as well as several other provisions of the Public Utilities Code. It sets forth the PUC's rules for the "general form and construction of tariff schedules required by Section 489," (GO 96-A, § I, subd. (B)), and establishes "the procedure to be followed in the filing and publishing of tariff schedules in compliance with Section[ ] . . . 455 . . . ." (GO 96-A, § I, subd. (B).) Section III of GO 96-A requires that "All tariff sheets shall be transmitted by an advice letter."

GO 96-A, subdivision V, provides in pertinent part: "A. **On Regular Notice.** A new tariff sheet covering a service or commodity not theretofore furnished or supplied, or a changed tariff sheet not increasing or resulting in an increase, . . . may be filed by . . . advice letter . . . . Such tariff sheets, unless suspended by the Commission either upon complaint or its own motion, will become effective after not less than the regular notice (fortieth calendar day after the filed date[5] . . . . [¶] B. **On Less Than Regular Notice.** Upon application in the advice letter, and for good cause shown, the Commission may authorize tariff sheets which do not result in increases in rates or charges to become effective on less than the forty (40) day notice period." (GO 96-A, § V, subds. (A) & (B).)

Section IV, entitled "Filed and Effective Dates," states that "The 'Effective' date is the date on which the rates, charges, rules, and classifications

---

[5]We note that section 455 provides for a 30-day period, whereas GO 96-A sets forth a 40-day period. However, SCE does not argue 30 days should be the standard, and indeed, its filing explicitly requested that the FOIMA become effective on the 40th day after filing. Thus, the question of whether GO 96-A impermissibly contradicts section 455 by imposing a 40-day, rather than a 30-day period, is not before us. For ease of reference, we shall refer to the applicable period as 40 days in this opinion. However, we do not mean by this language to imply any finding regarding whether the 40-day period does or does not offend section 455, nor do we express any opinion on the subject.

stated in the sheets, first become effective. This date shall not be less than the fortieth (40th) calendar day after the filed date unless authorization by the Commission be first obtained . . . ." (GO 96-A, § IV, subd. (B).)

### 3. *PUC practices regarding memorandum accounts.*

 The PUC asserts that it must formally approve, via a resolution or other formal procedure, a utility's request for a new memorandum account. The PUC asserts that this practice reflects "long-established Commission policy." SCE asserts that the PUC's requirement that it approve requests for memorandum accounts before they become effective is of recent vintage and has been inconsistently applied.

Resolution E-3606 listed numerous prior PUC decisions in support of its view that SCE's memorandum account could become effective only upon the date the PUC approved it. These decisions do, indeed, show that utilities have in the past sought formal PUC approval prior to establishing memorandum accounts, and that the PUC has not allowed sums to be recorded prior to the date a memorandum account was established.[6] However, none of the cited decisions discuss the application of section 455 or GO 96-A, nor do they address the question of whether a memorandum account can become effective under the "automatic" procedure set forth in section 455 and GO 96-A, as opposed to a formal resolution.

For example, in *In re Pacific Gas and Electric Company* (1993) 48 Cal.P.U.C.2d 430, PG&E was required, pursuant to a state agency consent order, to perform hazardous waste cleanup. PG&E filed an advice letter requesting approval of a memorandum account to record the costs, but the PUC did not act on the advice letter for approximately eight months. During the interim, PG&E was required to perform some of the cleanup work. However, the PUC disallowed inclusion in the memorandum account of expenses incurred prior to the date of the resolution approving it, even though PG&E protested that the PUC had failed to act on its advice letter in a timely fashion. (*Id.* at pp. 433-434.)

In Resolution E-3238, the PUC authorized utilities to pre-establish catastrophic memorandum accounts in which utilities could record expenses related to emergency operations. The PUC's resolution was prompted by the

---

[6]Resolution E-3606 also noted that PG&E, like SCE, filed an advice letter purporting to establish a memorandum account. PG&E requested that the account become effective 40 days after filing. Apparently, for essentially the same reasons set forth in its denial of SCE's request, in 1999 the PUC made PG&E's account effective upon the date the resolution in that matter was adopted.

aftermath of the Loma Prieta earthquake. Resolution E-3238 explained that, after the earthquake, several utilities requested authority to establish accounts to record all costs associated with the earthquake. However, the PUC determined that only costs incurred "after the accounts were authorized" were recoverable. To cure the resulting inequity, the PUC authorized utilities to pre-establish memorandum accounts. "Consistent with the Commission's usual practice for memorandum accounts, each energy utility desiring to avail itself of a Catastrophic Event Memorandum Account (CEMA) will be required to file and make effective on thirty days' notice an advice letter with tariff sheets reflecting its establishment." Thus, while the PUC allowed utilities to establish accounts effective on 30 days' notice, it had already approved the establishment of the accounts.

Other cited cases held similarly. (E.g., *In re Southern California Gas Co.* (1991) 39 Cal.P.U.C.2d 536 [full text available at 1991 Cal. PUC LEXIS 131, Apr. 10, 1991, Cal.P.U.C. Dec. No. 91-04-028 (authorizing Southern California Gas Company to establish memorandum account to record costs related to its move to new headquarters, and finding "SoCalGas will be able to recover only those expenses associated with its move to the new headquarters which are incurred after receiving the Commission's approval to record such expenses in a memorandum account or which are incurred after a decision on the merits of the application")]; *In re California-American Water Company* (1989) 32 Cal.P.U.C.2d 198 [full text available at 1989 Cal. PUC LEXIS 535, June 21, 1989, Cal.P.U.C. Dec. No. 89-06-053 (authorizing utility to record in memorandum account revenues lost due to drought-related mandatory water rationing, but disallowing recording in memorandum account any costs incurred prior to effective date of PUC decision approving account)].)

In this appeal, and below, SCE cited several decisions in which it contended the PUC had approved memorandum accounts with retroactive effective dates. Accordingly, SCE argued, the PUC had inconsistently applied its policy. However, the PUC distinguishes these cases on the ground that in each, the memorandum account had been previously approved by a statute or an earlier PUC decision. In contrast, the PUC asserts, SCE's memorandum account had no such prior approval.

The decisions cited by the parties suggest the PUC has in the past taken the position that its approval is required before a utility can establish a memorandum account. However, none of the cited decisions analyzed the basis for this requirement, or attempted to reconcile it with GO 96-A or section 455. Thus, the cited decisions tell us only that the PUC has in the

past insisted on approving memorandum accounts, and utilities have complied with the PUC's policy.

4. *A utility's tariff establishing a memorandum account may become effective by operation of law under section 455 and GO 96-A.*

GO 96-A and PUC practice apparently permit utilities to initiate establishment of a memorandum account via the procedure SCE used here, filing an advice letter attaching a tariff establishing a memorandum account. GO 96-A, section III, mandates that "[a]ll tariff sheets shall be transmitted by an advice letter." GO 96-A, section V, provides that "[a] new tariff sheet covering a service or commodity not theretofore furnished or supplied, or a changed tariff sheet not increasing or resulting in an increase . . . may be filed by the advice letter designated in Section III." In Resolution E-3238 (1991), the PUC stated that it was "[c]onsistent with [its] usual practice for memorandum accounts" for utilities to "file and make effective on thirty days' notice an advice letter with tariff sheets reflecting" establishment of a memorandum account. (E.g., *In re Southern California Edison Company* (1995) 58 Cal.P.U.C.2d 512, 517 [allowing SCE to establish a memorandum account by filing tariff sheets, in compliance with GO 96-A].) Indeed, the PUC does not argue that the procedural mechanism used by SCE was defective or inapplicable to memorandum accounts.

Such a procedure appears to fall squarely within the ambit of section 455 and GO 96-A.[7] Section 455 applies to any "schedule "stating a practice that does not increase or result in an increase in rates. Likewise, GO 96-A,

---

[7]The PUC argues that SCE cannot rely upon section 455 on appeal, because the utility failed to assert below that the PUC had misinterpreted section 455. The PUC points out that section 1732 clearly prohibits a utility from raising on appeal any ground not set forth in its application for rehearing below. That section provides: "The application for a rehearing shall set forth specifically the ground or grounds on which the applicant considers the decision or order to be unlawful. No corporation or person shall in any court urge or rely on any ground not so set forth in the application."

In its application for rehearing, SCE did argue that the PUC's imposition of the August 5 effective date violated GO 96-A. After stating that "[t]he Resolution should be amended to make the FOIMA effective January 1, 1999," SCE stated in a footnote that "A January 1, 1999 effective date would be consistent with other similar procedures provided for in the Public Utilities Code. For example, PU Code Section 455 provides that any schedule filed with the Commission that does not increase or result in any increase in any rate not suspended pending a hearing shall become effective on the expiration of 30 days from the time of filing with the Commission." The PUC contends this ambiguous and limited reference to section 455 was insufficient to preserve the issue for appeal under section 1732. SCE, for its part, contends that the reference to section 455 in the footnote "squarely raised the applicability of Section 455."

Our research has not uncovered, nor have the parties cited, any cases directly on point. However, we reject the PUC's argument on the facts of this case. GO 96-A explicitly states

subdivision V, applies to any tariff sheets not increasing or resulting in an increase. SCE's memorandum account can fairly be characterized as a "practice" within the meaning of the statute and GO 96-A.

SCE's filing did not increase, or result in an increase in, rates. Although the PUC's papers on appeal assert that "Edison was asking for a method of assigning the costs of the excess fuel oil to its customers," the record belies a finding that the FOIMA would have resulted in an increase in rates. Indeed, the PUC conceded as much in its original resolution and in its answer to the writ petition. The PUC's Resolution E-3606 stated, "The FOIMA is a memorandum account to allow Edison to track its incurred costs for its fuel oil inventory. *Actual recovery through rates of any expenses attributed to the operation of the FOIMA would have to be addressed by the Commission in a subsequent decision.*" (Res. E-3606, p. 12, ¶ 8, italics added; PUC's answer, p. 6 [memorandum accounts "are designed to record expenses that the Commission subsequently reviews for possible inclusion in rates"]; PUC's answer, p. 19 ["Though a memorandum account is a ratemaking tool, the order authorizing the opening of the account did not set rates"].)

Such a finding is in accord with earlier PUC decisions. For example, the PUC has previously stated, in the context of authorizing utilities to pre-establish catastrophic memorandum accounts, that the existence of a memorandum account does not automatically change rates: "recovery in rates is not guaranteed by the creation of [and booking into] memorandum accounts" and "it would be premature to presume or imply that there is assurance of full recovery of any or all costs included" in a catastrophic memorandum account. (Cal P.U.C. Res. E-3238 (July 24, 1991) pp. 3, 4.)

SCE's advice letter did not purport to establish authority for eventual pass-on to consumers of amounts recorded in the FOIMA. Its stated purpose was to *record* incurred expenses, so that "costs recorded in the FOIMA can be reviewed by the Commission in the applicable Annual Transition Cost Proceeding," and that "[t]his advice filing will not increase or decrease any

that it is the regulation implementing section 455. ("These rules are designed to provide for . . . . the procedure to be followed in the filing and publishing of tariff schedules in compliance with Sections 491, 454 and 455 of said Code . . . .") Thus, by relying upon GO 96-A, SCE was necessarily also referencing section 455. SCE does not assert that section 455 and GO 96-A are in conflict, or argue that section 455 invalidates GO 96-A; instead, it claims GO 96-A properly implemented section 455, and that for the same reasons, both sections consistently required the memorandum account to become effective 40 days after filing. Moreover, SCE did reference section 455 in its papers, albeit in a footnote. We find SCE's reliance on GO 96-A—section 455's administrative embodiment—coupled with the limited footnote reference, sufficiently preserved the issue on appeal within the meaning of section 1732.

rate or charge, cause withdrawal of service, or conflict with any schedule or rules."

Indeed, the PUC does not directly contend that the existence of a memorandum account results in an increase in rates. Instead, its argument is limited to an assertion that its decisions in Resolution E-3606 and Decision No. 99-11-057 never reached the issue of whether the FOIMA would result in an increase in rates. Though it is undisputed that the existence of the FOIMA was a prerequisite to eventual recovery in rates of costs, the FOIMA itself did not authorize SCE to pass on these costs. Given that further PUC approval is required before a utility can increase rates as the result of booking costs into a memorandum account, we cannot say the advice letter increased or resulted in an increase in rates within the meaning of section 455 or GO 96-A. Therefore, we find SCE's advice letter falls within the scope of both GO 96-A and section 455.

That being the case, the plain language of section 455 and GO 96-A suggests that a memorandum account filed pursuant to GO 96-A becomes effective 40 days after filing, unless the PUC acts to suspend the tariff establishing the account. Section 455 provides that, any practice "not so suspended *shall become effective* [upon] the expiration of 30 days from the time of filing thereof with the commission . . . ." (§ 455, italics added.) GO 96-A likewise is clear that, when a tariff sheet is filed by advice letter, unless the PUC suspends it, the tariff "will become effective after not less than the regular notice (fortieth calendar day after the filed date . . .)."

The language of both these provisions is mandatory. The Legislature's and PUC's use of the words "shall" and "will," respectively, demonstrates unambiguously that, after the expiration of the prescribed time, the practice or tariff goes into effect. ■ In determining the meaning of a statute, "we look first to the words of the statute, giving the language its usual, ordinary meaning. If there is no ambiguity in the language, we presume the Legislature meant what it said, and the plain meaning of the statute governs." (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 1000 [90 Cal.Rptr.2d 236, 987 P.2d 705]; *Acapulco Restaurants, Inc. v. Alcoholic Beverage Control Appeals Bd.* (1998) 67 Cal.App.4th 575, 580, fn. 5 [79 Cal.Rptr.2d 126] [rules of statutory construction apply equally to regulations].) "Ordinarily, the literal meaning of the words of a statute governs." (*People ex rel Dept. of Transportation v. Southern Cal. Edison Co.* (2000) 22 Cal.4th 791, 798 [94 Cal.Rptr.2d 609, 996 P.2d 711].) ■ Such is the case here: the language of the statute and GO 96-A is plain and unambiguous. If the PUC does not act to suspend a filing covered by GO 96-A and section 455, the tariff implementing the practice becomes effective 40 days after the filing date.

Furthermore, if section 455 and GO 96-A intended that filings may become effective only after formal PUC approval, the additional provision that the PUC could act to suspend the filing makes little sense. Such a provision would be unnecessary if the filed tariff was not to go into effect until the PUC approved it. ■ "In construing the words of a statute or constitutional provision to discern its purpose, the provisions should be read together; an interpretation which would render terms surplusage should be avoided, and every word should be given some significance, leaving no part useless or devoid of meaning." (*City and County of San Francisco v. Farrell* (1982) 32 Cal.3d 47, 54 [184 Cal.Rptr. 713, 648 P.2d 935].) ■ Here, the provisions regarding PUC suspension become meaningless surplusage if non-rate tariffs go into effect only upon formal PUC approval.

Additionally, our interpretation is supported by the fact that the Public Utilities Code and GO 96-A treat tariffs or filings resulting in a rate increase differently than those which do not. For example, section 454 states that "[e]xcept as provided in Section 455, no public utility shall change any rate or so alter any classification, contract, practice, or rule as to result in any new rate, *except upon a showing before the commission and a finding by the commission that the new rate is justified.*" (Italics added.) Likewise, GO 96-A requires that a utility may not change tariffs to *increase* rates "*until a showing has been made before the Commission and a finding by the Commission that such increase is justified.*" (GO 96-A, § VI, italics added.) This different treatment, in statute and the PUC's general order, of tariffs that increase rates versus those that do not supports a finding that the Legislature intended that specific Commission approval not be required when a utility proposes a non-rate change.

The PUC asserts that its approval is required before a utility can establish a memorandum account. The stated bases for the PUC's position are (1) this has been the PUC's long-standing practice; and (2) SCE acknowledged that a PUC resolution was required. The PUC does not set forth any particular provision, statutory or administrative, specifically governing the establishment of memorandum accounts, nor does it refer us to any regulation, statute, or administrative materials differentiating memorandum accounts from other tariff filings.[8] Indeed, the PUC does not directly assert in this appeal any reason why memorandum accounts cannot be established via the "automatic approval" mechanism set forth in GO 96-A.

---

[8]The PUC asserted below that allowing establishment of a memorandum account with a retroactive date—i.e., an effective date prior to the date the PUC approved the memorandum account—would violate the PUC's policy against retroactive ratemaking. As noted above, the parties disagree about whether the PUC's practice on this issue has been consistent. However, in this context, we find the PUC's assertion unpersuasive. Accepting for purposes of argument that the PUC has consistently required that the existence of the account predate

The PUC states that it "obviously acknowledges that certain tariff sheets filed by advice letter can become effective on 40-days notice unless suspended." It states that SCE's memorandum account request was not a "run-of-the-mill" tariff change, implying that only routine filings can be automatically approved under the GO 96-A procedure. However, the PUC does not explain which tariff filings are subject to the automatic approval process, why these unnamed filings must be treated differently than filings initiating memorandum accounts, or what order, regulation, or other provision of law authorizes such treatment.

Thus, even assuming the PUC had a well-established practice of requiring that memorandum accounts become effective only upon PUC approval, the PUC has provided no basis upon which we can find that practice in accord with section 455 and GO 96-A. We recognize that, "Whether a utility may proceed by an advice letter or instead must file a formal application for a particular tariff change is a decision peculiarly within the PUC's expertise and judgment [citation], not this court's. We will not disturb the PUC's selection between the procedures absent a manifest abuse of discretion or an unreasonable interpretation of the statutes governing its procedures [citation]." (*Pacific Bell v. Public Utilities Com., supra,* 79 Cal.App.4th at pp. 282-283.) Here, however, the PUC's actions appear to contravene its own general order, as well as section 455.

It is true that an administrative agency's interpretation of its own regulation is entitled to consideration and respect, especially where, as here, the agency has a special familiarity and expertise with the issues. (*Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th at pp. 7, 11-12.) However, an agency's interpretation of a regulation or statute does not control if an alternative reading is compelled by the plain language of the provision. (*Redding Medical Center v. Bonta* (1999) 75 Cal.App.4th 478, 484 [89 Cal.Rptr.2d 348]; *Motion Picture Studio Teachers & Welfare Workers v. Millan* (1996) 51 Cal.App.4th 1190, 1195 [59 Cal.Rptr.2d 608] [the principle of agency deference "does not permit the agency to disregard the regulation's plain language"].) Moreover, while we may defer to an administrative agency's construction of its own regulation, if the language of the rule does not require administrative expertise, we apply the regulation as we understand it. (*Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (1999) 71 Cal.App.4th 1518, 1520 [84 Cal.Rptr.2d 621].) As explained in *Yamaha:* "Courts must, in short, independently judge

---

recordation of costs, this contention is somewhat circular. If SCE's interpretation of the statute and GO 96-A is correct, then the FOIMA was established and effective as of January 1, 1999; thus, recording amounts incurred from that time forward raises no retroactivity issue.

the text of the statute, taking into account and respecting the agency's interpretation of its meaning, of course, whether embodied in a formal rule or less formal representation. Where the meaning and legal effect of a statute is the issue, an agency's interpretation is one among several tools available to the court. Depending on the context, it may be helpful, enlightening, even convincing. It may sometimes be of little worth." (*Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th at pp. 7-8.) Here, the PUC offers us no basis for its reading of either section 455 or GO 96-A. The PUC asserts that it has long insisted upon approving memorandum accounts, but gives us no explanation of how it squares section 455 or GO 96-A with its current practice. Thus, in this instance, we have nothing to which we can meaningfully defer.

Accordingly, we hold that on the facts presented here, a tariff attaching a memorandum account falls within the ambit of section 455 and GO 96-A, and becomes effective as a matter of law 40 days after filing, unless suspended by the PUC.[9] A filing that does not raise rates can either be suspended by the PUC, or it will go into effect—without any further approval or Commission action—40 days after filing. The PUC can suspend a non-rate advice letter and tariff within 40 days; it can also modify the tariff in accord with section 455. However, if it allows the 40 days to pass without suspending the advice letter and tariff, the tariff goes into effect as a matter of law.

### 5. *SCE's request for a resolution did not preclude its use of the "automatic" procedure.*

Having found that a tariff initiating a memorandum account can be filed pursuant to section 455 and GO 96-A, section V, and under those provisions becomes effective automatically unless suspended, we next address whether these principles applied in this instance. Thus, we turn to the question of whether the language used in advice letter No. 1351-E and SCE's request for a formal resolution precluded its use of the "automatic" procedure.

The PUC argues that, by explicitly requesting its memorandum account be approved by a PUC resolution, and by acknowledging such approval was required, SCE has waived or is estopped from asserting any right it had to rely upon the automatic approval provisions of section 455 and GO 96-A.

---

[9]The PUC and SCE both concur that a utility could designate, in its advice letter, an effective date later than 40 days after filing. The PUC also points out that the Commission and utilities sometimes agree that a particular advice letter will not go into effect until after the statutory 40-day period. We see no reason why such designations and agreements would be ineffective or would violate GO 96-A or section 455. Nothing in this opinion is intended to cast doubt upon such practices.

As indicated, SCE's advice letter stated, "It is requested that this advice filing become effective on the 40th calendar day after the date filed . . . ." It also stated, because "this advice filing proposes the establishment of a new memorandum account, a resolution is required for approval." In response to SCE's advice letter, the PUC initiated proceedings in compliance with section 311, subdivision (g)(1). That section requires that, "Prior to voting on any commission decision not subject to subdivision (d), the decision shall be served on parties and subject to at least 30 days public review and comment." Any "alternate decision" must also be served upon all parties and must be subject to public review and comment before it may be voted upon. (§ 311, subds. (e), (g).) Here, the PUC prepared and served both a draft resolution and a draft alternate resolution, and SCE commented upon both. Ultimately, a formal vote and resolution were undertaken, as requested by SCE.

(a) *Waiver.*

The PUC argues that by requesting a formal resolution, and acknowledging that one was required, SCE "opted out" of any right it had to avail itself of the automatic approval process contemplated by section 455 and GO 96-A. It points out that, "An advice letter can become effective only once. Edison cannot ask to have a memorandum account become effective by way of resolution, and then later say that it became effective automatically under section 455 and GO 96-A." We disagree that SCE's choice of words and conduct constituted a waiver in this instance.

█ The principles underlying the waiver doctrine are well settled. " ' "Waiver always rests upon intent. Waiver is the intentional relinquishment of a known right after knowledge of the facts. [Citations.] The burden, moreover, is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and 'doubtful cases will be decided against a waiver.' " ' [Citations.]" (*DRG/ Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd.* (1994) 30 Cal.App.4th 54, 60 [35 Cal.Rptr.2d 515]; *City of Ukiah v. Fones* (1966) 64 Cal.2d 104, 107-108 [48 Cal.Rptr. 865, 410 P.2d 369].) "The pivotal issue in a claim of waiver is the intention of the party who allegedly relinquished the known legal right." (*DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd., supra,* at p. 60; *Jovine v. FHP, Inc.* (1998) 64 Cal.App.4th 1506, 1527 [76 Cal.Rptr.2d 322].)

█ The waiver doctrine applies in the administrative context "if the administrative record shows that the applicant has made a knowing, intelligent, and voluntary waiver in circumstances where the applicant might

reasonably anticipate some benefit or advantage from the waiver, and if the waiver does not seriously compromise any public purpose that the Act's time limits were intended to serve." (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1050 [68 Cal.Rptr.2d 758, 946 P.2d 427], abrogated by statute in regard to its construction of the Permit Streamlining Act [Stats. 1998, ch. 283, § 5].)

 SCE explains it made a request for approval "[b]ecause the Commission's staff had recently insisted that it approve similar advice letters, and because SCE expected that certain parties would challenge this advice letter." SCE notes that its "recognition that Commission approval was required shows that such approval was required to address the protests *after* the tariff had become effective." (Italics original.) Moreover, it suggests its use of the term "requested" was merely "a polite way of acknowledging the Commission's power to suspend the effective date."

We agree that the language used by SCE in its advice letter was ambiguous. SCE did not expressly invoke the section 455 "automatic" procedure. Moreover, the automatic procedure for approval contemplated in section 455 and GO 96-A appears fundamentally incompatible with the resolution procedure requested by SCE. For example, section 311, subdivision (g) imposes procedural requirements when the PUC votes out a resolution. Under section 311, subdivision (g), the PUC must release·a proposed resolution to the public 30 days before adoption. Additionally, the PUC also must consider possible protests, may issue an alternate draft resolution for comment, and must vote on a resolution. At.oral argument, both parties conceded that this process could not have been completed in time for the PUC to issue a resolution within 40 days.

In our view, SCE's filing was either one that fell within the purview of section 455 and GO 96-A, or it was not. If the filing came within the statute's ambit, after the PUC chose not to suspend the filing, the tariff automatically became effective at the expiration of 40 days by operation of law, with no further approval necessary. If the filing fell outside the statute, then there is no reason why the August 5, 1999 date should not apply.

Thus, SCE's invocation of the resolution procedure, coupled with its request for application of the section 455 time frame, was unclear. On the .other hand, SCE did not make any express statement indicating it intended to waive its rights under section 455 and GO 96-A. Indeed, SCE referenced the statutory time frame when commenting on the PUC's draft resolution, noting

that: "Furthermore, in full compliance with the Commission's General Order 96-A, Section IV.B., SCE properly filed Advice [letter No.] 1351-E on November 20, 1998, 40 days prior to SCE's requested FOIMA effective date of January 1, 1999." While SCE did not explicitly say that, in its view, the FOIMA had already become effective, it did not abandon its reliance upon the statutory time frame.

In light of the plausible explanations offered by SCE for its request, we cannot find a clear and convincing showing of intentional relinquishment of a known right. It is at least arguable that SCE's intent was to avail itself of the statutory procedure, while at the same time attempting to comply with the PUC's own requirement that memorandum accounts be approved by a resolution. Equivocal or speculative evidence of a waiver is insufficient. (*Jovine v. FHP, Inc., supra,* 64 Cal.App.4th at p. 1527; *City of Ukiah v. Fones, supra,* 64 Cal.2d 104, 108, fn. omitted ["To uphold [a finding of waiver] it would be necessary to speculate on the motives that dictated the choice of language used in the stipulation. The parties offer us a variety of conflicting motives from which to choose. But we need not undertake to resolve these conflicts, for the very necessity of such speculation demonstrates that the city's proof of waiver is not 'clear and convincing' . . . ."].)

Furthermore, given the PUC's posture that Commission approval was required in order to establish a memorandum account, SCE was stuck between a rock and a hard place. If it did not request a formal resolution, it risked not obtaining the memorandum account; if it did request a formal resolution, it risked potential waiver of the operation of section 455 and GO 96-A. (Cf. *Bickel v. City of Piedmont, supra,* 16 Cal.4th at p. 1052 ["if an agency improperly coerces an applicant into relinquishing the right to have the agency act within the statutory time limits, the applicant cannot be said to have voluntarily given up that right. In that event, there is no valid waiver"].)

Moreover, we fail to see what benefit SCE could have hoped to gain by waiving its right to rely upon section 455's automatic procedure. The 40-day period contemplated by GO 96-A ensured quicker establishment of the FOIMA than did the resolution process. As SCE points out, if it had "waived the rule of automatic effectiveness, it would have been assured of not receiving an effective tariff for many months until the PUC acted; by invoking the rule, SCE at least had a strong position that the tariff was effective earlier."

### (b) *Estoppel.*

The PUC argues that SCE is estopped from relying upon GO 96-A's automatic approval provisions.[10] It contends that the ambiguous language used in SCE's advice letter, in which SCE "requested" an effective date of January 1, 1999, but also acknowledged that a PUC resolution was required for approval, lulled the PUC into a false sense of security, causing it to believe no suspension order was required while it considered SCE's requested resolution. The PUC argues SCE should not be allowed to "take advantage of the Commission's inaction" by subsequently asserting the memorandum account became effective automatically.

■ The doctrine of estoppel "affirms that 'a person may not lull another into a false sense of security by conduct causing the latter to forebear to do something which he otherwise would have done and then take advantage of the inaction caused by his own conduct." (*Tresway Aero, Inc. v. Superior Court* (1971) 5 Cal.3d 431, 437-438 [96 Cal.Rptr. 571, 487 P.2d 1211].) "The doctrine of estoppel is made up of four elements: ' "(1) the party to be estopped must be apprised of the facts; (2) [it] must intend that [its] conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) [the other party] must rely upon the conduct to [his or her] injury." [Citations.]' " (*Jovine v. FHP, Inc., supra,* 64 Cal.App.4th at p. 1528.)

■ Here, the PUC's argument fails because the record does not establish the element of reliance. The record is devoid of evidence the PUC relied upon SCE's statements in the advice letter to its detriment. In its briefs, the PUC does not set forth facts showing actual reliance. Instead, it asserts that the PUC "could" have or "should" have been able to rely upon the wording of SCE's letter and conclude suspension was not required. Moreover, SCE's application for rehearing clearly asserted that the FOIMA should have become effective on January 1, 1999, by operation of law. The PUC's decision denying rehearing did not assert that it had relied upon its interpretation of SCE's advice letter as a basis for not suspending the tariff. Instead, the PUC relied upon its own view that a PUC resolution was required to establish a memorandum account.[11] Had the PUC actually relied upon the advice letter as it now suggests, we would have expected the PUC to have so

---

[10]Because the PUC's briefing arguably suggested it intended to make an estoppel argument, we invited and have considered further briefing on the issue from the parties.

[11]For example, Decision No. 99-11-057 stated: "Section V(A) of the Commission's General Order 96-A provides for, *but does not automatically authorize,* certain tariff sheets filed by advice letter becoming effective after the fortieth day of the advice letter filing, unless the

stated in its denial of the application for rehearing. Given this lack of evidence of reliance, we cannot find the estoppel doctrine applicable.

6. *The PUC's imposition of the August 5, 1999 date cannot be justified as an exercise of its power to alter or modify the tariff after a hearing.*

Finally, the PUC argues that section 455 authorizes the PUC to modify or alter a tariff "after a hearing." It asserts that the Commission's standard practice is to conduct a "paper hearing" on an advice letter, with the parties having the opportunity to submit arguments and comments in writing. It notes that neither SCE nor any other party requested a formal hearing with the taking of evidence. Thus, the PUC asserts, for all practical purposes it did conduct a hearing, and therefore had the power to modify the filing.

As noted, section 455 states: "All rates, classifications, contracts, practices, or rules not so suspended shall become effective on the expiration of 30 days from the time of filing thereof with the commission or a lesser time as the commission may grant, *subject to the power of the commission, after a hearing had on its own motion or upon complaint, to alter or modify them.*" (Italics added.)

Whatever the parameters of the PUC's ability to modify or alter the memorandum account after it became effective, it is clear the PUC did not purport to undertake such a modification here.[12] We may not affirm an agency's action on a basis not embraced by the agency itself. (*Securities Comm'n v. Chenery Corp.* (1943) 318 U.S. 80, 94 [63 S.Ct. 454, 462, 87 L.Ed. 626]; *Motor Vehicle Mfrs. Assn. v. State Farm Mut.* (1982) 463 U.S. 29, 50 [103 S.Ct. 2856, 2870, 77 L.Ed.2d 443] [it is well settled "that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."].) Instead, the PUC's action "must be measured by what [the agency] did, not by what it might have done." (*Securities Comm'n v. Chenery Corp., supra,* at pp. 93-94 [63 S.Ct. at p. 462].) Moreover, a court "may not accept appellate counsel's *post hoc* rationalizations for agency action." (*Motor Vehicle Mfrs. Assn. v. State Farm Mut., supra,* at p. 50 [103 S.Ct. at p. 2870].)

---

filing is suspended by the Commission. . . . [¶] However, Edison understood when it filed its advice letter, that Section V(A) would not apply to its request for a new memorandum account, and that the request would have to be approved by a Commission resolution." (Italics added.)

[12]SCE and amici curiae contend section 455 does not authorize the PUC to retroactively modify the effective date of a memorandum account. However, as the PUC did not purport to retroactively modify the effective date in this instance, this question is not properly before us and we express no opinion on the subject.

Here, the PUC did not purport to exercise its power under section 455 to modify the tariff retroactively. Neither Resolution E-3606 nor the PUC's order denying rehearing suggested that its imposition of the August 5, 1999 effective date was the result of a modification pursuant to section 455. Furthermore, it is not clear that the PUC conducted a hearing within the meaning of section 455, nor has it cited any legal authority for such a "paper hearing" procedure. Finally, it is not clear the PUC "altered or modified an existing tariff," because the PUC has steadfastly argued that the memorandum account did not exist until it approved it on August 5, 1999.

## CONCLUSION

We hold that, under circumstances where establishment of a memorandum account does not increase rates and the PUC does not act to suspend the tariff establishing the account under section 455 or GO 96-A, the tariff will become effective, at the latest, 40 days after filing, unless the PUC and the utility agree to a different date or the utility designates a different date in its filing.

## DISPOSITION

Let a writ issue directing the PUC to recognize the effectiveness of the tariff establishing the FOIMA as of January 1, 1999, and allowing SCE to record costs incurred between January 1, 1999, and August 5, 1999.

Klein, P. J., and Croskey, J., concurred.