Filed 11/15/23  Grosvenor Gibraltar Associates v. McMillan Bros. Electric CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| GROSVENOR GIBRALTAR ASSOCIATES, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> MCMILLAN BROS. ELECTRIC, INC., <br><br> Defendant and Respondent. | A166226 <br><br> (San Francisco City & County <br> Super. Ct. No. CGC21594639) |

This is an appeal from a judgment in a commercial lease dispute involving the setting of fair market rent for an additional lease term.  Under the lease, the lessee McMillan Electric, Inc. was entitled to exercise a renewal option by giving written notice to the lessor Grosvenor Gibraltar Associates.  McMillan seemingly gave such notice, triggering a multi-step process set forth in the option provisions of the lease to determine the fair market rent for the new term.  After the parties proceeded through several of these steps, McMillan took the position its prior written notice was not, in fact, an actual exercise of the option but merely notice of an intent to exercise it at some point in the future and therefore it was not contractually obligated to comply with the option provisions of the lease.  At this point, Grosvenor refused to take the next step in the rent determination process unless and until

1

McMillan confirmed it was, in fact, exercising the renewal option. Eventually, the parties reached a negotiated resolution that entailed McMillan confirming in writing it was exercising the option and Grosvenor approving a change of use of part of the premises and a sublease of the entire premises. This agreement did not, however, resolve the rent for the new term, and Grosvenor sued for declaratory relief.

The matter was tried by the court solely on the basis of documents, namely the lease and correspondence at the time between the parties. Ultimately, the issue boiled down to whether, after McMillan announced it had not exercised the option and was not contractually bound by the option provisions of the lease, Grosvenor was nevertheless required to take the next step in the fair market rent determination process (disclosing its consultant's opinion as to fair market rent). The trial court ruled, as a matter of law, that Grosvenor had waived McMillan's compliance with the first step of the option process (written notice by McMillan that it was, in fact, exercising the renewal option). This ruling resulted, in turn, in the court ruling McMillan's consultant's fair market rent opinion, alone, set the rent.

We reverse and remand for further proceedings consistent with this opinion.

## BACKGROUND

### *The Pertinent Option Provisions of the Lease*

The pertinent option provisions of the lease are as follows:

"2.6 **Renewal Option** [¶] . . . [¶]

"(b) Tenant shall have the right and option . . . to extend the Original Term . . . , the first Renewal Term commencing on the first day of March, 2022. . . . Each Renewal Term shall be at the Base Rent provided in Section 3.1.3(b) hereof . . . and otherwise on all the same terms covenants and conditions contained in this Lease. Tenant may exercise each Renewal Option (i) no earlier than the first day of the

2

twelfth (12th) calendar month prior to the Original Expiration Date (with respect to the first Renewal Term) and (ii) no later than the first day of the eighth (8th) calendar month prior to the Original Expiration Date (with respect to the first Renewal Term). . . . In addition, Tenant may exercise each Renewal Option only by giving Landlord written notice of the exercise of the Renewal Option on any date included in the Intervening Period (and the date when Tenant shall have timely exercised the Renewal Option in accordance with the provisions of this Section 2.6 is herein referred to as the 'Exercise Date'). . . . In the event that Tenant shall fail or, due to a default, shall be unable to validly exercise a Renewal Option in a timely manner in accordance with the provisions of this paragraph (b), the Renewal Option shall terminate or be deemed to have terminated."

"**3.1.3 Adjustment of Base Rent Upon Each Renewal Term** [¶] . . . [¶]

"(b) '**Fair Market Rent'** shall mean the rate being charged to similarly situated Tenants for comparable space in similar buildings in the appropriate vicinity. . . . Fair Market Rent shall be determined by Landlord with written notice (the '**Notice of Option Term Rent**') delivered to Tenant no later than fifteen (15) days following receipt of Tenant's notice of exercise of the option. . . . If Tenant disagrees with Landlord's proposed Base Rent, the parties shall have a period of fifteen (15) days ([]the '**Negotiation Period**') in which to attempt to reach agreement on the Fair Market Rent.  If agreement cannot be reached before the expiration of the Negotiation Period, each party shall appoint a consultant. . . . Within ten (10) days after the expiration of the Negotiation Period, each consultant shall simultaneously submit to the other a written opinion of Fair Market Rent (each party's 'best and final' offer).  If only one consultant timely submits its 'best and final' opinion, then the figure proposed by that consultant shall be fixed as the Base Rent for the first year of the option term.

"(c) If the two such opinions are within five (5%) percent of the lower of the two figures, then the Base Rent for the first year of the option term shall be the average of the two such opinions.  If not, then within ten (10) days after the exchange, the two consultants shall select a neutral arbitrator. . . . Neither the parties nor the parties'

3

consultants shall disclose to the Neutral their 'best and final" offers, nor details of any prior negotiations between the parties.

"(d) Within thirty (30) days after the appointment of the Neutral, the Neutral shall independently render an opinion of the Fair Market Rent. . . . The three opinions of Fair Market Rent shall be compared, and the Base Rent for the first year of the option shall be the 'best and final' offer of the consultant which is closest to the Neutral's independent opinion.

"(e) If the foregoing process has not been concluded prior to the commencement of the option term . . . , Tenant shall pay the monthly rent at the rate submitted as Landlord's 'best and final' offer from the first day of the option term until a decision is reached. If the amount of the Fair Market Rent as determined [by] the foregoing process is greater than or less than Landlord's 'best and final' offer, then any adjustment required to adjust the amount previously paid shall be made by the appropriate party within ten (10) days after such determination of Fair Market Rent."

Thus, the lease spells out the following process for determining rent during the first option period:

One, the lessee gives written notice of exercise of the renewal option. Such written notice is to be given between the first of the twelfth month and the first of the eighth month prior to the expiration of the original lease term.

Two, within 15 days of receiving the lessee's written exercise of the renewal option, the lessor is to give the lessee written notice of lessor's intended "base rent" for the option period.

Three, if the lessee disagrees with the lessor's intended base rent, the parties are to enter into a 15-day negotiation period.

Four, if negotiations do not resolve the dispute, the parties, within 10 days, are to hire consultants and simultaneously share their consultant's opinion as to fair market rent.

4

Five, if the consultants' opinions are within five percent of one another, the base rent for the first year is the average of the two. If the opinions differ more significantly, within 10 days after the exchange, the two consultants will select a neutral arbitrator.

Six, within 30 days after selection, the neutral arbitrator will render an independent opinion. The consultant's opinion closest to the neutral's opinion shall fix the base rent for the first year.

### *The Operative Events*

By letter dated January 20, 2021, McMillan, by its CEO and President William Musgrave, sent Grosvenor a letter stating in pertinent part:

"This letter serves to notify the Landlord that the Leasee [*sic*] will be exercising its option to renew the leases noted above for another 5 year term (the 'First Renewal term').

"Per the Original Lease Agreements . . . , the Original Term for those leases ends on February 28, 2022.[1] Beginning on March 1, 2021 and ending on February 28, 2022 (the final period of the Original Term), the rent paid by McMillan Electric will be. . . .

"In agreement with the renewal terms noted within the Original Lease Agreements, effective March 1, 2022, the rent will increase to Fair Market Rent, which shall be determined by the Landlord and provided to McMillan Electric with written notice no later than 15 days following receipt of this notice to exercise our lease option. Section 3.1.3 of the Original Lease clearly notes how Fair Market Rent is to be calculated and how McMillan Electric shall be notified. [¶] . . . [¶]

"Other than the request to alter the rent payment for the final period of the Original Term, all other terms, conditions, and provisions of the Original Lease shall be incorporated into the First Renewal Term and

---

[1] Thus, the letter was dated 11 days before the commencement of the contractually specified " 'Intervening Period' " (i.e., the "first day of the twelfth (12th) calendar month prior to the Original Expiration Date").

are to remain in full force and effect until the First Renewal Term agreement is duly signed. . . ."

At some point, Grosvenor provided written notice of its intended base rent for the option period.[2] McMillan disagreed with the intended base rent, and the parties engaged in extended, but ultimately unsuccessful, negotiations.[3]

Grosvenor eventually sent McMillan a letter dated June 30, 2021, that stated:

"You have exercised your option to renew this lease for another 5-year term (the 'First Renewal Term'). We provided you with our proposal for Fair Market Rent. Since you have not agreed with that or proposed a compromise, then the Negotiation Period is over and the lease provides that each of us will appoint a qualified consultant who are to simultaneously submit to the other a written opinion of Fair Market Rent. If the two opinions are within 5% of the lower of the two figures, then the Base Rent for the first year of the option shall be the average of the two such opinions. If not, then the two consultants are to select a qualified Neutral consultant who shall independently render an opinion of the Fair Market Rate. The Base Rent for the first year of the option term shall be whichever consultant's opinion is closest to that of the Neutral consultant.

"Attached please find a letter from our consultant with his best and final opinion of Fair Market Value [sic] for this space. The .pdf is password protected so that you will not be able to access the information until you have provided us with the information from your consultant. If you do not provide us with the best and final opinion of Fair Market Value [sic] from your qualified consultant within 10 days

---

[2] The record does not reflect whether Grosvenor provided this notice within 15 days of receiving McMillan's January 20th letter.

[3] Thus, the negotiations continued for a significantly longer period than the 15 days specified in the lease. The record does not reflect the reason for this, although we note McMillan's January 20th letter additionally asked for a reduction of the rent for the final year of the original lease term due to the economic impact of the Covid-19 pandemic.

6

of this letter, then we will provide you with the password and, pursuant, to Paragraph 3.1.3(b) the figure proposed by our consultant shall be fixed as the Base Rent for the first year of the option term."

Two days later, McMillan, through counsel, responded by letter dated July 2, 2021. This letter stated in pertinent part:

"Mr. Werby [(Grosvenor's Manager)] claims that Tenant has exercised its option to renew the Lease for another five year term. That statement is incorrect. The Lease is very clear that the first renewal option may only be exercised after the first day of the 12th calendar month prior to the expiration date. (See Section 2.6(b)). The expiration date is February 28, 2022, so the earliest that the option may be exercised is February 1, 2021. Tenant's letter to Landlord was sent on January 20, 2021.

"Furthermore, Tenant's letter of January 20, 2021 merely referenced an intention to exercise the renewal option. Tenant never followed up with an actual exercise of the renewal option. Quoting the letter, Tenant stated '***This letter serves to notify the Landlord that the Leasee [sic] will be exercising its option. . . .***' This is consistent with the fact that Tenant was not permitted to exercise the renewal option until a later date. The letter goes on to propose business terms that would have an impact on Tenant's final decision as to whether to actually exercise the option. Landlord never responded to these proposed terms, which requested a slight rent reduction due to Covid-19. . . .

"We note that your letter indicated that the 'negotiation period' has expired. Even if Tenant had properly exercised the renewal option by its January 20, 2021 letter, the 15-day negotiation period would have expired, and Landlord would have missed its deadline to appoint a consultant and submit such consultant's opinion of fair market rent, as defined in the Lease. Given this, Landlord would not have the right to unilaterally establish a new 10-day deadline. We point this out for informational purposes only given that Tenant did not exercise the option in the manner specifically required by the Lease.

"Tenant remains interested in discussing the fair market rent for the Premises, based on the parameters set forth in the Lease. . . .

7

"We suggest that the parties confirm a reasonable period of time to negotiate the fair market rent. . . ."

One week later, McMillan's attorneys sent a second letter dated July 9, 2021, which stated:

"We have not received a response to our letter dated July 2, 2021. Although our position is that the renewal option was not exercised by Tenant, and that the 10-day response deadline is not applicable, we are enclosing McMillan Electric's opinion of Fair Market Rent for the Premises, as prepared by its real estate broker. This is submitted solely for the purpose of satisfying any obligations that may arise under Section 3.1.3(b) of the Lease (if any), and HCM Commercial Properties/Chris Harney is appointed for that purpose.

"McMillan Electric is willing to discuss confirming an agreement concerning a reasonable timeline and process for confirming the Fair Market Rent. Please contact me if you would like to proceed with such a discussion. In the meantime, Tenant reserves all rights and defenses with respect to this matter. We look forward to hearing from you."

Two weeks later, Grosvenor responded through counsel by letter dated July 25, 2021. This letter stated in pertinent part:

"We understand the Tenant contests whether it has exercised an option terms for the premises. Suffice it to say the voluminous emails and actions by the Tenant, and Landlord's good faith responses and reasonable reliance on Tenant's communications and actions make it irrefutable that both parties were acting as if the options terms have been exercised. We are prepared to litigate this issue if necessary. The more productive route, however, would be to proceed to reach agreement regarding the applicable Fair Market Rent (FMR) for the option term rent for each of the premises at issue.

". . . Communications indicate Tenant rejects Landlord's proposed option term base rent amounts and that negotiations are at an impasse. Therefore, agreement for Fair Market Rent was not reached during the Negotiation Period. Lease Sec. 3.1.3(b). Each party thereafter within 10 days after the expiration of the Negotiation Period shall appoint a

8

consultant to determine Fair Market Rent with certain specified credentials. On June 30, 2021, our client timely provided notice of its consultant. The Leases provide for simultaneous exchange of consultant opinions. On July 9, 2021, we acknowledge receipt of Tenant's consultant's opinion of Fair Market Rent. Landlord advises that Tenant's consultant's opinions of Fair Market Rent are rejected.

"Because the two opinions of the parties' respective FMR opinions are not within five percent of each other, then within 10 days of July 9, the two consultants shall select a neutral arbitrator (the 'Neutral'). Lease Sec. 3.1.3(c). Landlord will agree to provide Tenant with the password to Landlord's consultant's opinion of FMR only if Tenant retracts its position that the option term has not been exercised, and affirmatively represents in writing that it is bound by the lease process to determine FMR. This writing must occur within 10 days of the date of this correspondence. Assuming, your clients wish to continue to participate in the process to determine FMR and avoid litigation, and provides written representation that it agrees to be bound by the FMR process because the option term has been duly exercised by Tenant, then, and only then will Landlord direct its consultant to contact Tenant's consultant directly for the [purpose] of selecting and appointing a neutral consultant ('Neutral'). . . ."

McMillian responded by letter dated July 30, 2021. This letter stated in pertinent part:

"For a number of reasons, relating in part to the effect of COVID on its business, the loss of a subtenant, issues related to the discovery of asbestos and of certain previously undisclosed zoning restrictions, my client no longer wishes to renew the Lease. This—no dispute here—is a change of plan. Until relatively recently McMillian intended to renew, and told your client of its intent. You claim that the expression of our intent to exercise an option is the legal equivalent of signing the Lease renewal. We disagree, but our first choice is not to spend money litigating that issue, but instead to come [to] an agreement about the terms of a termination of the Lease. . . .

"As to what the rent for any option term would be, should you be correct that McMillan is committed to that term, that has now been

9

established.  It would be the amount proposed by Mr. Harney, for the following reasons.

". . . On June 30, 2021 Todd Werby sent a PDF document that supposedly contained the 'best and final' offer of Landlord's consultant. Mr. Werby password-protected it, stating that the password would be provided only when we provided *our* consultant's best and final offer. This was reasonable, in light of the requirement for simultaneous exchange.  Mr. Werby set a deadline of July 10 for us to provide our own consultant's best and final offer.

"On July 9, before the deadline set by Mr. Werby, we disclosed Chris Harney as our consultant and gave you our 'best and final offer. . . .'

"But, neither you nor Landlord nor consultant have transmitted anything.  We've waited three weeks.  You have told us that the numbers are more than 5% apart, but we have no way on knowing that. . . .

"We now know from your letter of July 25th that you don't even *intend* to give us your consultant's number, at least, not unless and until McMillan comes around to your position on the legal effect of recent communications.  We're not doing that. [¶]  . . . [¶]

". . . [B]ecause 'only one consultant' (Mr. Harney) has timely submitted his opinion, his number is the rent for the option term. . . .

"Now, I cannot emphasize strongly enough: this does not mean that we are agreeing to a renewal term, even at Mr. Harney's rent number.  It simply means that if you are correct that McMillan is committed against its current will to a renewal term, the rent will be that determined by Mr. Harney. . . .

"Perhaps your client does not wish to enter an option term with the rent set by Mr. Harney, in which case we should reach an agreement. As stated above, my client is willing to modestly extend out the original term, so that your client has all the contractually required time (eight months) to find a replacement.  The rent for any extension . . . can be negotiated, and it can be more than the current monthly rent."

The record does not indicate what transpired during the following month. Apparently, McMillan's CEO and President, sent an e-mail directly to Grosvenor's board of directors, which precipitated a letter dated August 26, 2021, from Grosvenor's attorneys to McMillan's attorneys. This letter stated in pertinent part:

> "We are in receipt of a copy of an email dated August 25, 2021, sent by your client, William Musgrave, directly to our client's board of directors. We request that all future communications to the lessor regarding this commercial lease dispute are sent to my attention. In addition, our client takes exception with several items in Mr. Musgrave's email:
>
> "There has been no delay in response to a request for determining a fair market rent because your client continues to take the position it has not exercised the option term. In effect, your client wants to negotiate a fair market rent and if it does not achieve a desired result then claim it has no obligation under the option term that our client contends has been duly exercised. This is a fundamental first step before option term rent can be negotiated. Either the option term is in play or it is not. . . .
>
> "We propose that our client will agree to enter forthwith into lease negotiations with the prospective tenant provided that such discussions do not constitute any waiver of lease rights under the respective leases for the Premises. . . ."

Nearly three months later, a string of e-mails commencing November 15, 2021 confirmed an agreement to allow a change of use to part of the leased premises and that McMillan would confirm that "the option to extend the lease term has been exercised." McMillan's e-mail stated: "In light of the very favorable sublease opportunity with Mantle, and assuming good faith in Grosvenor's approvals and review of this matter, we hereby confirm, as requested by your e-mail, that the option to extend the lease term has been exercised and ask that you now approve all outstanding requests relating to

11

the sublease so that we may move to conclusion this week."  Grosvenor approved the sublease of the entire premises a month later, on December 10, 2021.

The record does not reflect what transpired during the following month and a half.  On February 20, 2022, Grosvenor sent McMillan a letter providing the password to the .pdf containing Grosvenor's consultant's opinion of the fair market rent and stating "[d]emand is made for the tenant to pay rent consistent" with that opinion "commencing March 1, 2022[,] when the option term commences as required by Lease Section 3.1.3(e)."[4]

McMillian, through its CEO and President, responded by letter dated March 7, 2022.  This letter stated in pertinent part:

> "As per the terms of the lease and as noted by Todd Werby on June 30, 2021, both parties were to provide their 'best and final' opinions by July 10, 2021.  At that time, a PDF was provided to ME that supposedly included the 'best and final' opinion of GGA, but the document was locked with a password.  On July 9, 2021, ME disclosed Chris Harney as our consultant and gave GGA our 'best and final' opinion. . . . [¶] . . . [¶]
>
> "As a result of GGA not providing its 'best and final' opinion timely . . . we believe fair market rent is [as opined by Harney]."

***The Trial Court Rulings***

As to whether Grosvenor was required to proceed with the rent determination process after McMillan stated it had not exercised the option for an additional lease term, the court ruled as follows:

---

[4] As we have recited, Section 3.1.3(e) becomes operative when "the foregoing [fair market rent determination] process has not been concluded prior to the commencement of the option term" and spells out the interim rent ("at the rate submitted as Landlord's 'best and final' offer") until the fair market rent process is concluded, with appropriate adjustments then made to the rent paid to date.

12

"Despite its July 2 protestations [that it had not exercised the option for an additional lease term], on July 9, McMillan nevertheless in 'satisfying any obligations that may arise under Section 3.1.3 (b)' submitted the opinion by its consultant Mr. Harney of its assessment of FMR with supporting documentation. (Exhibit E) This opinion was effectively the only timely opinion submitted as Grosvenor did not reveal the password for its consultant's opinion, even after receiving McMillan's July 9 disclosure."

"Paragraph 3.1.3 (b) of the lease provides:

" 'Within ten (10) days after the expiration of the Negotiation Period, each consultant shall *simultaneously* submit to the other a written opinion of Fair Market Rent (each party's "best and final" offer). *If only one consultant timely submits its "best and final" opinion, then the figure proposed by that consultant shall be fixed as the Base Rent for the first year of the option term.'* . . . (Exhibit C)

"The issue is whether, when McMillan provided its consultant's evaluation on July 9, that in turn obligated Grosvenor to unlock its password protected information for a 'simultaneous' exchange of information. (Section 3.1.3 (b)) Or, because McMillan claimed on July 2 that it had not exercised its option to renew, did that instead trigger a condition precedent, namely Section 2.6 of the lease contract–requiring McMillan to first 'retract' its July 2 position even when it ultimately timely complied with Grosvenor's demands for consultant information, in its July 9 letter?

"The Court declares, once McMillan complied with the requirement to simultaneously exchange FMR information, pursuant to section 3.1.3(b), and as set forth in the explicit conditions outlined in Grosvenor's letter of June 30, it had complied with the terms of the lease(s) and Grosvenor was then obligated to do the same.

"Indeed, in its letter of July 25, 2021, Grosvenor acknowledged, 'it is irrefutable that both parties were acting as if the options terms have been exercised[.]' (Exhibit F) Grosvenor noted: 'The leases provide for simultaneous exchange of consultant opinions.' They further acknowledge 'On July 9, 2021, we acknowledge receipt of Tenant's consultant's opinion of Fair Market Rent.' (Exhibit F)

13

"Yet, rather than comply with the clear terms of the leases (and its own demands), once McMillan timely provided its data, Grosvenor did not release the password protection. Instead, Grosvenor simply advised that McMillan's consultant's opinions of FMR were 'rejected.' (Exhibit F)

"Grosvenor added: 'We trust this process will proceed as the Lease provides. . . . .' (Exhibit F) Despite its expressed desire to adhere to the terms of the lease, it [Grosvenor] now seeks to effectively bypass the clear requirements of section 3.1.3(b) and move directly to section 3.1.3(c), notwithstanding its own failure to timely simultaneously submit (by providing the password to unlock) its consultant's opinions."

The court went on to rule that Grosvenor "apparently waived the 15-day negotiation period," "chose not to timely respond to the arguments McMillan raised about whether it had 'exercised' the option to renew," and "failed to adhere to the 10-day simultaneous disclosure [period] set forth in its own letter of June 30 and as clearly required in Section 3.1.3(b)."

It further ruled Grosvenor, as a matter of law, "waived" the requirement that McMillan actually exercise the renewal option as a predicate to proceeding with the fair market rent determination process because Grosvenor "accepted the 'benefit' of McMillan's consultant's opinions and supporting documentation without providing its own consultant's information." "Whatever McMillan's protestations, the fact is it timely complied with Section 3.1.3(b) and the demands set forth in Grosvenor's letter of June 30." McMillan "did not fail to fulfil a term of the contract because it turned over its consultant's opinions." Accordingly, "by its own words and actions, Grosvenor waived the right to insist that McMillan first retract its position regarding exercising the option to renew (Exhibit F, July 25 letter), or its right to proceed directly to Section 3.1.3 (c) (selecting a neutral arbitrator), as it did not first comply with Section 3.1.3(b)."

14

## DISCUSSION

### *Standard of Review*

The parties agree our standard of review of the judgment interpreting the parties' obligations under the lease is de novo.

McMillan suggests the standard of review pertaining to the trial court's waiver ruling is more nuanced. McMillan recognizes that " 'where there are no disputed facts and only one reasonable inference may be drawn, [waiver] can be determined as a matter of law.' " (*DuBeck v. California Physicians' Service* (2015) 234 Cal.App.4th 1254, 1265, quoting *Gill v. Rich* (2005) 128 Cal.App.4th 1254, 1264, fn. 10.) But it asserts that if the trial court's inference "*was* reasonable" we are "bound by it under the deferential substantial evidence standard *even if* a different reasonable inference might have been drawn." This assertion is pertinent to cases where waiver has been decided as a question of fact. (See *Bower v. Inter-Con Security Systems, Inc.* (2014) 232 Cal.App.4th 1035, 1043 (*Bower*).)[5] Here, however, the trial court, citing *DuBeck*, decided waiver as a matter of law, a legal ruling we review de novo. (See *Bower,* at p. 1043.)

---

[5] As Division Three of this court explained in *Bower,* "[t]he question of waiver is generally a question of fact, and the trial court's finding of waiver is binding on us if it is supported by substantial evidence. [Citation.] 'We infer all necessary findings supported by substantial evidence [citations] and "construe any reasonable inference in the manner most favorable to the judgment, resolving all ambiguities to support an affirmance." ' [Citation.] Reversal is not justified simply because the trial court could have potentially reached a different conclusion on the question of waiver. '[R]ather, we may reverse the trial court's waiver finding only if the record establishes a lack of waiver *as a matter of law.*' " (*Bower, supra,* 232 Cal.App.4th at p. 1043.)

15

***Lessor Did Not Waive Requirement That Lessee Exercise Renewal Option***

As our Supreme Court has "explained in various contexts, ' "waiver" means the intentional relinquishment or abandonment of a known right.' (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1048. . . .)[6]  Waiver requires an existing right, the waiving party's knowledge of that right, and the party's 'actual intention to relinquish the right.' (*Bickel*, at p. 1053.) ' "Waiver always rests upon intent." ' (*City of Ukiah v. Fones* (1966) 64 Cal.2d 104, 107 . . . [(*Fones*)].)  The intention may be express, based on the waiving party's words, or implied, based on conduct that is ' "so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." ' (*Savaglio v. Wal-Mart Stores, Inc.* (2007) 149 Cal.App.4th 588, 598 . . . .)" (*Lynch v. California Coastal Com.* (2017) 3 Cal.5th 470, 475 (*Lynch*).)  The burden of proof lies with " ' " 'the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and "doubtful cases will be decided against a waiver." ' " ' " (*Southern Cal. Edison Co. v. Public Utilities Com.* (2000) 85 Cal.App.4th 1086, 1107 (*Southern Cal. Edison*), quoting *DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd.* (1994) 30 Cal.App.4th 54, 60 (*DRG/Beverly Hills*).)  "Equivocal or speculative evidence of a waiver is insufficient." (*Southern Cal. Edison,* at p. 1109.)

In ruling Grosvenor waived the first step of the renewal option process—that McMillan give written notice of its exercise of the option—the trial court relied on the principle that "[w]aiver may be implied by conduct that is

---

    **6** Abrogated by statute in regard to its construction of the Permit Streamlining Act (Stats. 1998, ch. 283, § 5).

so inconsistent with an intent to enforce a right as to induce a reasonable belief that such right has been relinquished," citing *Lynch*.  It further observed that in *Gould v. Corinthian Colleges, Inc.* (2011) 192 Cal.App.4th 1176 (*Gould*), the appellate court stated " 'acceptance of benefits under a lease is conduct that supports a finding of waiver.' "  Based on these two propositions, the court concluded Grosvenor "accepted the 'benefit' of McMillan's consultant's opinions and supporting documentation without providing its own consultant's information" and thus "waived" the threshold requirement that McMillan actually exercise the option to renew.  Neither *Lynch* nor *Gould* warrant such a conclusion.

In *Lynch*, the plaintiffs obtained a development permit from the California Coastal Commission that was subject to several special conditions. (*Lynch, supra,* 3 Cal.5th at p. 474.)  Additionally, before the permit could issue, the plaintiffs had to record deed restrictions stating the special conditions were covenants, conditions, and restrictions on the use and enjoyment of their premises, which they did.  (*Id.* at p. 475.)  About this same time, the plaintiffs filed a petition for writ of mandate, challenging the conditions. (*Ibid.*)  The commission moved for judgment on the ground the plaintiffs "waived" their challenges to the conditions by "accepting the permit conditions and constructing the project."  (*Ibid.*)  The trial court granted the petition, and the Court of Appeal affirmed in a split decision.  (*Ibid.*)

The Supreme Court reversed, concluding the issue was not one of waiver, but of "equitable forfeiture."  (*Lynch, supra,* 3 Cal.5th at p. 476, italics omitted.)  "In the land use context," explained the high court, "a landowner may not challenge a permit condition if he has acquiesced to it either by specific agreement, or by failure to challenge the condition while accepting

17

the benefits afforded by the permit." (*Ibid.*) Rather, the owner must generally first challenge allegedly unlawful conditions in administrative mandamus proceedings. (*Id.* at p. 477.) Further, "permit holders" are generally "obliged to accept the burdens of a permit along with its benefits." (*Id.* at p. 478.) The court declined to carve out a severability exception based on asserted exigencies necessitating the construction of the seawall. It "could be difficult," said the court, "to determine whether a particular condition is truly severable," the instant conditions being ones in point. (*Id.* at p. 480.) Thus, while the plaintiffs had timely filed an administrative mandamus challenge, "they forfeited their objections [to the permit] by constructing the project." (*Id.* at p. 482.) Accordingly, other than setting forth the fundamental requirements of waiver, to which we will return, *Lynch* is wholly inapposite to the case at hand.

In *Gould*, the lessor of a commercial property sought a declaration that the lessee had not satisfied one of the conditions to permit early termination of the lease, specifically that the lessee pay the lessor $136,500 " 'in cash or immediately available funds' " on or before the early termination date. (*Gould, supra,* 192 Cal.App.4th at p. 1178.) The lessee had already paid the lessor $136,500 at the time it delivered notice of exercising its right to early termination, as also required by the lease. (*Ibid.*) The lessee sent the lessor a check for $120,057.10 in conjunction with applying $16,442.90 of its security deposit to which it believed it was entitled (for a total of $136,500). (*Ibid.*) The lessor responded that the lessee had breached the lease by applying a portion of the security deposit, but retained the check and other funds the lessee had paid. The trial court ruled the lessee had, in fact, satisfied the lease condition, that even if it had not, it had substantially complied, and

18

that in any case, by retaining the monies, the lessor had waived any supposed noncompliance with the final payment condition. (*Id.* at p. 1179.) The Court of Appeal affirmed on the latter ground, i.e., that the lessor had "accepted and retained" the payments. (*Ibid.*)

Notably, the lessee in *Gould* never took the position it had *not* exercised its right to early termination of the lease and thus was *not* contractually required to satisfy the payment requirements. To the contrary, it maintained it was in compliance with the early termination provisions. McMillan, in contrast, maintained (repeatedly) that it had not exercised the renewal option and therefore had no obligation to comply with any of the option provisions of the lease, including the requirement that it share its consultant's fair market rent opinion. Neither party cites, nor are we aware of, any authority that supports waiver where the party seeking to invoke the doctrine insisted at the time that it was not bound by contractual provisions it belatedly claims were waived.

The trial court ruled, specifically, that Grosvenor "accepted the 'benefit' " of McMillan's disclosure of its consultant's fair market rent opinion. We cannot agree with this characterization of Grosvenor's conduct.

As we have recited, after Grosvenor sent McMillan its consultant's fair market rent opinion with an encryption pending McMillan's timely exchange of its consultant's opinion, McMillan unequivocally responded that it had not, in fact, exercised the renewal option and therefore it was under no contractual obligation to timely share its consultant's opinion. Instead, McMillan "suggest[ed] that the parties confirm a reasonable period of time to negotiate fair market rent." One week later, McMillan sent a follow up letter complaining Grosvenor had not yet responded. McMillan began by reiterating it had

19

not, in fact, exercised the renewal option and therefore it was under no contractual obligation to share its consultant's opinion. McMillan then stated it nevertheless had enclosed its consultant's opinion "solely for the purpose of satisfying any obligations that might arise under Section 3.1.3(b) of the Lease (if any)." McMillan closed by repeating its desire "to discuss confirming an agreement concerning a reasonable timeline and process for confirming the Fair Market Rent." Thus, McMillan began and ended its follow up letter by reiterating it had *not* exercised the renewal option and it had *no* obligation under the option provisions to provide its consultant's opinion, making it clear that *as far as McMillan was concerned* it was *voluntarily* providing Grosvenor with its consultant's opinion.

Two weeks later, Grosvenor responded to McMillan's letters. It took issue with McMillan's assertion it had not, in fact, exercised the renewal option, summarized the option provisions pertaining to simultaneous disclosure of consultant opinions, "acknowledge[d] receipt of" McMillan's consultant's opinion, and "rejected" the opinion, stating the parties' consultants' opinions were more than five percent apart and therefore, under the lease, a neutral arbitrator should be selected. Grosvenor went on to state it would provide the password to its consultant's opinion "only if Tenant retracts its position that the option term has not been exercised, and affirmatively . . . represents in writing that it is bound by the lease provisions to determine FMR." If McMillan "provide[d] written representation that it agrees to be bound by the [FMR] process because the option term has been duly exercised by Tenant, then, and only then will Landlord direct its consultant to contact Tenant's consultant directly for the purpose of selecting and appointing a neutral consultant."

The trial court focused primarily on Grosvenor's "acknowledge[d] receipt" of and "rejection" of McMillan's consultant's opinion as evidencing Grosvenor's supposed acceptance and retention of McMillan's performance under the lease. However, we fail to see how Grosvenor's mere receipt of McMillan's follow up letter enclosing its consultant's opinion constitutes any kind of affirmative act by Grosvenor, let alone, an act waiving compliance with the option provisions of the lease, including the threshold requirement that McMillan actually exercise the option. (See *Southern Cal. Edison, supra,* 85 Cal.App.4th at p. 1109 ["Equivocal or speculative evidence of a waiver is insufficient."]; see also *DRG/Beverly Hills, supra,* 30 Cal.App.4th at p. 60 [" ' "doubtful cases will be decided against a waiver" ' "].) This is not akin to the situation in *Gould*, where the lessee *parted with* and the lessor retained money. McMillan did not part with anything. It sent Grosvenor a *copy* of its consultant's opinion and, according to McMillan, did so voluntarily because the option provisions were not yet in play.

Moreover, before waiver can be predicated on a party's conduct, that conduct must be " ' "so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." ' " (*Lynch, supra,* 3 Cal.5th at p. 475, quoting *Savaglio v. Wal-Mart Stores, Inc., supra,* 149 Cal.App.4th at p. 598.) Grosvenor's mere receipt of McMillan's follow up letter enclosing its consultant's opinion was not conduct that was "inconsistent" with an intent to enforce the threshold requirement that McMillan actually exercise the renewal option, let alone conduct that " ' "induce[d] a reasonable belief" ' " by McMillan that Grosvenor relinquished its right to enforce that condition precedent to any other obligations under the option provisions. The trial court appears to have overlooked this latter requirement— that McMillan must have reasonably believed that Grosvenor's mere receipt

21

of its letter induced McMillan to believe Grosvenor waived the requirement that McMillan actually exercise the renewal option in order to trigger the lease provisions pertinent thereto.  As the record reflects, it is clear McMillan did *not* believe Grosvenor had waived any lease provision.  Rather, McMillan believed (or purported to believe), and repeatedly told Grosvenor, that the option provisions were *not operative* because it had never actually exercised the option.  Indeed, in its letter responding to Grosvenor's letter, McMillan repeated what it had previously said—that the renewal option provisions were not operative because it had not yet exercised the option.

The remainder of Grosvenor's letter further underscores that there is no clear and convincing evidence that Grosvenor waived McMillan's compliance with the threshold requirement—that McMillan actually exercise the renewal option before the parties had any further contractual obligation under the option provisions.  Indeed, Grosvenor could not have stated any more explicitly that it would not comply with the mutual exchange requirement unless and until McMillan provided the requisite notice that it *was* exercising its option and agreed it *was* bound by the option provisions of the lease.

In short, read in context and in its entirety, Grosvenor's response to McMillan's July 2d and 9th correspondence, as a matter of law, did not waive Grosvenor's right to insist that McMillan actually exercise the renewal option before Grosvenor took any further steps under the option provisions.  Even assuming there could be any doubt as to Grosvenor's intent (see *Lynch, supra,* 3 Cal.5th at p. 475, quoting *Fones, supra,* 64 Cal.2d at p. 107 [" ' "[w]aiver always rests on intent' "]), which in our view there cannot, that does not, and cannot, establish a waiver by Grosvenor.  (*DRG/Beverly Hills, supra,* 30 Cal.App.4th at p. 60 [" ' "doubtful cases will be decided against a waiver" ' "].)

As we see it, McMillan essentially tried to "have it both ways." On the one hand, it insisted at the time that it had not exercised the renewal option and therefore the option provisions of the lease were not operative and it had no contractual obligation to comply with any of those provisions, including simultaneous sharing of its consultant's opinion on fair market rent. Rather, what it wanted at that time, was for Grosvenor to agree to a rent determination process *outside* the option provisions of the lease. On the other hand, after it was sued, McMillan took the opposite position—that the option provisions *were* operative. It asserted Grosvenor both waived the (operative) requirement that McMillan provide written notice exercising the renewal option and was required to comply with the (operative) requirement that the parties simultaneously exchange consultant opinions. Moreover, since Grosvenor had not complied with the (operative) exchange requirement, McMillan was entitled under the (operative) rent determination provisions to rent set solely on the basis of its own consultant's opinion.[7] Again, the parties have not cited, nor are we aware of, any authority suggesting this is a scenario that can support waiver.[8]

---

[7] This enabled McMillan to skip over the process the option provisions otherwise called for, which was for the parties' consultants to agree upon a neutral third party who would render an independent opinion as to fair market rent. The consultant's opinion closest to the neutral's opinion would fix the base rent for the first year.

[8] Although we need not, and do not reach, the issue, McMillan could well be equitably estopped to assert waiver. The doctrine of estoppel " 'affirms that "a person may not lull another into a false sense of security by conduct causing the latter to forebear to do something which he otherwise would have done and then take advantage of the inaction caused by his own conduct.' " (*Southern Cal. Edison, supra,* 85 Cal.App.4th at p. 1110, quoting *Tresway Aero, Inc. v. Superior Court* (1971) 5 Cal.3d 431, 437–438.) This would appear to be a fair description of what transpired here.

Our conclusion that Grosvenor did not waive McMillan's compliance with the threshold requirement of the renewal option—that McMillan actually exercise the option—as a predicate to any other obligations or entitlements under the option provisions of the lease, has the following consequences: First, Grosvenor was not contractually required to proceed with the exchange of its consultant's opinion. Second, McMillan cannot use Grosvenor's decision not to proceed with the exchange as a basis to invoke the provision set forth in section 3.1.3(b) stating, "If only one consultant timely submits its 'best and final' opinion, then the figure proposed by that consultant shall be fixed as the Base Rent for the first year of the option term." Third, since McMillan has now provided written notice that it has exercised the renewal option, the parties must, once this opinion becomes final, commence the rent determination process as set forth in, and in the procedural order set forth in, sections 3.1.3(b), (c), and (d). Fourth, since the rent determination process set forth in these provisions was not concluded prior to the commencement of the option term, the provisions of section 3.1.3 (e) also apply.

### The Attorney Fee Award

In its order after trial, the trial court found McMillan "to be the prevailing party, and thus entitled to attorney fees and costs subject to proof." Thereafter the parties filed fee motions. McMillan sought an award of fees. Grosvenor filed a counter-motion, maintaining neither party should be deemed to have prevailed. The court ultimately ruled there was no prevailing party, reasoning there were "two causes of action" and the parties had

each prevailed on one.[9]  Since we have reversed the "cause of action" on which McMillan prevailed, we also reverse the fee order predicated on that "cause of action" and remand for further proceedings as to fees and costs.[10]

***Motion For Restitution***

In conjunction with its opening brief, Grosvenor filed a "Motion For Restitution," asking, if it succeeded on appeal, for a directive to the trial court, pursuant to Code of Civil Procedure section 908, "that the parties be returned so far as possible to the positions they occupied before the enforcement of or execution on the judgment or order."[11]  Grosvenor alerted McMillan such a motion would be forthcoming in a letter responding to McMillan's assertion that, pursuant to the trial court's ruling, it would be reducing its rent payment to that consistent with its consultant's opinion.  Grosvenor also

---

[9] We grant Grosvenor's "Motion For Judicial Notice" filed December 16, 2022.  We deny its "Supplemental Motion For Judicial Notice" filed March 30, 2023 as the attached exhibit is irrelevant to our disposition.

[10] We therefore need not, and do not, examine whether the parties' and the trial court's use of the terminology "causes of action" is technically correct.

[11] Code of Civil Procedure section 908 states:

> "When the judgment or order is reversed or modified, the reviewing court may direct that the parties be returned so far as possible to the positions they occupied before the enforcement of or execution on the judgment or order.  In doing so, the reviewing court may order restitution on reasonable terms and conditions of all property and rights lost by the erroneous judgment or order, so far as such restitution is consistent with rights of third parties and may direct the entry of a money judgment sufficient to compensate for property or rights not restored.  The reviewing court may take evidence and make findings concerning such matters or may, by order, refer such matters to the trial court for determination."

made reference to its motion for restitution in its opening brief. McMillan filed opposition to the motion.

There is no question that, to the extent possible, Grosvenor should be placed in as good a position as it would have been in had McMillan not, on July 2, 2021, taken the position it had not exercised the renewal option and therefore the renewal provisions of the lease were not operative. (See *Beach Break Equities, LLC v. Lowell* (2016) 6 Cal.App.5th 847, 852 (*Beach Break Equities*) ["[a]s a general rule, when a judgment is reversed on appeal, the appellant is *entitled* to restitution for all things lost by reason of the [erroneous] judgment," italics omitted].) Had McMillan not taken that position, the renewal rent setting process would have proceeded and, under the terms of the renewal provisions, the new rent would have been determined within 40 days (10 days for consultants to select neutral arbitrator and 30 days for arbitrator to render an independent opinion). As it was, pursuant to the trial court's ruling, McMillan took the position, in a letter dated August 25, 2022, that its own consultant's opinion, alone, set the rent. Because it had been paying a higher rent, McMillan further asserted it had been "overpay[ing]" and was entitled to a credit for the overage plus interest on the overage.

Depending on the outcome of the arbitration process that will take place pursuant to our opinion, it may or may not be determined that McMillan has since at least August 25, 2022, been underpaying Grosvenor. If it is determined McMillan has been underpaying, Grosvenor should be "returned so far as possible to the position[] [it] occupied before" McMillan effectively "commenced enforcement" of the trial court's order (which regardless of its nomenclature is a declaratory judgment). How this should be accomplished— by order of the neutral arbitrator or restitution ordered by the trial court—is, under the circumstances, a question we are in no position to answer. We

shall therefore return the matter to the trial court for further proceedings under Code of Civil Procedure section 908.

In its opposition to Grosvenor's motion, McMillan points out restitution to a successful appellant can be denied where it "would be inequitable" (*Beach Break Equities, supra,* 6 Cal.App.5th at p. 853) and it hints Grosvenor might have engaged in inequitable conduct at some point during the litigation. (See *Gunderson v. Wall* (2011) 196 Cal.App.4th 1060, 1065–1068 [affirming denial of restitution in light of postjudgment efforts to evade collection that forced partially successful appellant to incur substantial additional attorney fees].) We are compelled to observe that at least with respect to the record before us we see no evidence whatsoever of such conduct.

## DISPOSITION

The judgment is REVERSED and the matter remanded for entry of judgment in favor of appellant Grosvenor and for further proceedings consistent with this opinion. Costs on appeal to appellant.

_____
Banke, J.

We concur:

_____
Richmond, Acting P.J.

_____
Bowen, J.*

* Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A166226, *Grosvenor Gibraltar ass. V. McMillian Elec*